**Herman RESNICK, Plaintiff–Appellant,**

v.

**Michael ADAMS, Warden; Mike Szafir, Administrator, Food Order and Services, Defendants–Appellees.**

No. 01–56710.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 8, 2002.

Filed Jan. 27, 2003.

Amended Nov. 3, 2003.

Erwin Chemerinsky, Los Angeles, CA, argued the case for the plaintiff-appellant and filed briefs.

Robyn–Marie Lyon Monteleone, Assistant United States Attorney, Los Angeles, CA, argued the case and was on the brief for the defendants-appellees, Debra W. Yang, United States Attorney, and Leon W. Weidman, Assistant United States Attorney, were on the brief.

Before HUG, BRUNETTI, and O'SCANNLAIN, Circuit Judges.

## ORDER AND AMENDED OPINION

### ORDER

This court's previous opinion, filed on January 27, 2003, and published at 317 F.3d 1056, is withdrawn and replaced by the amended opinion filed concurrently with this order. With this amendment, the panel has voted unanimously to deny the petition for rehearing.

Judge O'Scannlain has voted to deny the petition for rehearing en banc, and Judges Hug and Brunetti so recommend. The petition for rehearing en banc was circulated to the full court, and no judge requested a vote on the petition. Fed. R.App. P. 35.

With this amendment, the petition for rehearing and petition for rehearing en banc are DENIED. No further petitions for rehearing or requests for amendment will be accepted.

## OPINION

O'SCANNLAIN, Circuit Judge.

We must decide whether prison officials unconstitutionally infringed an inmate's First Amendment right to the free exercise of religion by requiring him to fill out a standard prison form in order to receive kosher food.

### I

Herman Resnick is an Orthodox Jew who has been incarcerated at the United States Penitentiary at Lompoc, California ("Lompoc"), since January 1998. According to the dictates of his faith—specifically the laws of the kashruth[1]—Resnick must maintain a kosher diet. Lompoc, like all other federal prisons, accommodates the religious dietary needs of its inmates through the Common Fare Program ("CFP"). See 28 C.F.R. § 548.20(a) ("The Bureau [of Prisons] provides inmates requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of budget limitations and the security and orderly running of the institution and the Bureau through a common fare

menu."). The general parameters of the CFP are set forth in section seven of Program Statement Number 4700.04 ("P.S. 4700.04"), which was issued by the Bureau of Prisons on October 7, 1996. P.S. 4700.04 provides that "[t]he Chaplain is the approving official for inmate participation and removal in the Common Fare Program."

Under 28 C.F.R. § 548.20(a), inmates are required to "provide a written statement articulating the religious motivation for participation in the common fare program." More specific guidance about the CFP at Lompoc—and the procedures for applying to the program—are supplied to each inmate by the Religious Services Department upon admission and orientation to the prison, when each inmate is provided with a handout that discusses religious diets. The handout reiterates the need to submit an application for the CFP to the chaplain and includes an application form that lays out the requirements of the program. Once an inmate has applied to the CFP at Lompoc, and the chaplain has approved the application, the chaplain is responsible for entering the necessary information into the computerized database known as Sentry. According to P.S. 4700.04, "[t]he inmate shall ordinarily begin eating from the Common Fare menu within two days after Food Service receives electronic notification."

On March 3, 1998, Resnick, like all newly arrived inmates at Lompoc, was informed by prison chaplain Fr. Mike Kirkness that he would be required to submit an application to participate in the CFP if

1. "Jews following kashruth may only eat animals with split hooves and that chew their cud and certain fowl and fish with scales and fins. Dairy products and meat are not allowed to be consumed in the same meal. It is customary to wait at least six hours after consuming meat to eat dairy and at least one hour after drinking milk to eat meat. Fruits,

vegetables, and some cereals qualify as kosher. Kosher food must remain physically separate from nonkosher food, as must utensils and plates. Disposable utensils satisfy kosher requirements." *Ashelman v. Wawrzaszek*, 111 F.3d 674, 675 n. 2 (9th Cir. 1997).

he desired to receive kosher meals. Resnick did not do so. Although he never submitted an application to the CFP, Resnick eventually did write letters to prison officials and the Lompoc chaplains requesting kosher food. Resnick's letters—the only evidence he offers to demonstrate his complaints to prison officials about the CFP at Lompoc—were dated June 28 and 29, 1999, some 16 months after he was first incarcerated at Lompoc. Fr. Kirkness responded in writing to Resnick, asking him to "[p]lease see one of the chaplains and fill out an application for inclusion in this program. If you then have some problems they can be addressed appropriately by Food Service and Religious Services." Lompoc warden Michael Adams also responded to Resnick's letter and similarly informed him that "[f]ood Service and Religious Services have advised me that they are willing to work with inmates who have identified special needs regarding religious diet. Therefore, you are asked to apply for the Common Fare Program and then if there is a problem, inform staff, so that it may be resolved."

Resnick had not filed the required application to enter the CFP by the time he wrote the letters to prison officials. Instead, he brought this action *pro se*, asserting claims under 42 U.S.C. § 1983, the Religious Freedom Restoration Act of 1993 ("RFRA"), and *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Resnick contended that unnamed prison officials had violated his First Amendment right to free exercise of religion by denying him kosher meals. Pursuant to Local Magistrate Rule 1.3, Resnick's complaint was referred to a magistrate judge, who dismissed it with leave to amend for failure to comply with Federal Rule of Civil Procedure 10(a).[2]

In due course, Resnick filed his first amended complaint which both named various prison officials as defendants in their individual and official capacities and deliberately *"remove[d]"* his RFRA cause of action. The magistrate judge, in response to the prison officials' April 1999 motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim, recommended that the district court dismiss with prejudice all of Resnick's claims against defendants in their official capacities, and dismiss without prejudice Resnick's First Amendment and equal protection claims against defendants in their individual capacities. On August 6, 1999, the district court adopted the magistrate judge's report and recommendation and granted Resnick leave to file a second amended complaint.

Resnick filed his second amended complaint on August 11, 1999, naming only Warden Michael Adams and Mike Szafir, Lompoc's food services administrator, as defendants. On February 25, 2000, Adams and Szafir moved for summary judgment, claiming that they were entitled to qualified immunity. The magistrate judge recommended that the district court deny Adams's and Szafir's motion. The district court, however, rejected the magistrate judge's recommendation and granted defendants' motion for summary judgment on qualified immunity grounds in an order entered July 12, 2001, from which Resnick now appeals.

II

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court held that "[a] court re-

---

**2.** Resnick failed to comply with the part of Rule 10(a) that requires the complaint to "in-    clude the names of all the parties." Fed. R.Civ.P. 10(a).

quired to rule upon the qualified immunity issue must consider ... this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? This must be the initial inquiry." *Id.* at 201, 121 S.Ct. 2151. If there would be no constitutional violation even were the allegations taken as true, the Court noted, then "there is no necessity for further inquiries concerning qualified immunity." *Id.* It is only when "a violation could be made out on a favorable view of the parties' submissions" that a court evaluating a claim of qualified immunity should proceed to "the next, sequential step [of] ask[ing] whether the right was clearly established." *Id.* at 201, 121 S.Ct. 2151.

Thus, at the outset, we must identify precisely the constitutional violation being asserted by Resnick. To do so, however, it must be clear what Resnick does *not* assert. As the district court correctly noted, Resnick does not challenge the constitutionality of the CFP, either facially or as applied to him.[3] Furthermore, because Resnick never applied for, let alone participated in, the CFP, the evidence he adduces to demonstrate the failure of the CFP to provide kosher meals is irrelevant. As the district court correctly noted, "[u]nless Resnick participated, or attempted to participate, in the Common Fare Program,

he could not be injured by, and would have no standing to challenge, deficiencies in the administration of the program at Lompoc." *See Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 166–67, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) (holding that plaintiff lacks standing to challenge club's membership policies because "he never sought to become a member").

Resnick further asserts that he was excused from applying for the CFP because any such application would have been futile. But uncontroverted evidence indicates that such an application may *not* have been futile. First, prison officials did not categorically refuse to provide Resnick with kosher meals, nor did they tell him that the CFP was the only way for him to receive a kosher meal. Instead, they assured Resnick that, once he applied to the CFP, they would work with him to ensure that his problems are addressed appropriately. Furthermore, both parties acknowledge that there was at least one inmate at Lompoc receiving a completely kosher diet, which establishes that prison officials might have been capable of working with Resnick to ensure that his needs would be addressed appropriately.[4] Resnick therefore cannot claim that his application would have been futile.[5] *See Jackson–Bey v. Hanslmaier,* 115 F.3d 1091, 1095 (2d Cir.1997) (holding that, where prisoner has decided "not to follow the simple proce-

3. Resnick does not raise a facial or as applied challenge for one simple reason: He has failed to exhaust his administrative remedies. Thus, any such challenge would have been dismissed.

4. We say "might have been capable" because not all Jews who keep kosher recognize all kosher certifications as equally authoritative. Thus, the fact that another inmate was receiving a diet that he considered satisfactorily kosher, while persuasive, does not mean that Resnick himself would find it to be so.

5. Resnick attempts to dismiss this conclusion by arguing that the inmate in question was extradited to the United States from Israel and maintains a kosher diet under special order. As the district court correctly noted, however, the reasons why this inmate receives a kosher diet are irrelevant: The fact that another prisoner receives the type of kosher diet to which Resnick contends he has a right clearly supports the inference that, had he submitted an application to participate in the Common Fare Program, Resnick may have received the kind of religious diet he sought.

dure of registering his religion" with prison authorities, and where prisoner has failed to make a "substantial showing" that registration would be futile, prisoner lacks standing to bring suit).

Thus, at bottom, Resnick alleges—and can only allege—that the requirement that he submit an application in order to receive kosher meals was by itself an unconstitutional infringement of his right to free exercise. The district court recognized this, concluding that "because defendants did not categorically refuse to provide Resnick with a kosher diet, the only conduct in which they engaged that could have violated his First Amendment rights was their insistence that he submit an application for the Common Fare Program...."

■ The district court's order, however, while very thorough and well reasoned, did not have occasion to consider *Saucier*, and so did not make an evaluation regarding the nature of the alleged constitutional violation at the start of its analysis. Rather, the district court proceeded directly to the issue of whether Resnick's right to a kosher diet was "clearly established." A preliminary assessment of the alleged constitutional violation, however, is now required by *Saucier*, and its importance to the qualified immunity analysis becomes apparent in a case such as this where we are dealing with the constitutional rights of a prisoner. For Supreme Court precedents, as well as those of this court, make clear that even "clearly established" rights are subject to reasonable limitations in the prison context.

## III

■ We turn now, as *Saucier* requires, to the issue of whether "the facts alleged show the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.[6] While the Supreme Court has noted that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), it nevertheless acknowledges that "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Id.* at 89, 107 S.Ct. 2254. Thus, the Court has determined that prison regulations that are alleged to tread upon constitutional liberties should be evaluated under a "reasonableness" test—one that is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

■ As formulated by the Court in *Turner*—and subsequently applied by this court in *Ashelman*, 111 F.3d 674, and

6. Although we have grave constitutional doubts about applying to Resnick's bare constitutional claims the enhanced standards of review implied by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *see, e.g., City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), we need not resolve those doubts here. For whether or not those acts apply of their own force to such naked constitutional claims, and whether or not those acts could withstand constitutional scrutiny in the event they do, their possible application could only be triggered by a demonstration that the burden imposed on Resnick's free exercise was "substantial." *See* 42 U.S.C. §§ 2000bb–1(a)(b) & 2000cc–1(a). Because requiring him to sign a piece of paper effectively to satisfy standing and exhaustion requirements is by no stretch a "substantial" burden, these acts by their own terms cannot apply to Resnick's claims.

*Ward v. Walsh,* 1 F.3d 873 (9th Cir. 1993)—the test weighs four factors in determining the reasonableness of a prison regulation affecting constitutional rights. The district court correctly noted that *Turner*'s balancing test was applicable, but did not proceed through the four-part analysis required. The court instead concluded that because the prison officials failed to "delineate the budgetary, security or administrative implications of providing Resnick kosher meals ... [Resnick] has met his burden of demonstrating that the right allegedly violated was clearly established." But this conclusion ignores the district court's own finding that "the only conduct in which [Adams and Szafir] engaged that could have violated [Resnick's] First Amendment rights was their insistence that he submit an application for the Common Fare Program before attempting to negotiate a diet that would satisfy the laws of kashruth." The district court, by focusing on the "implications of providing Resnick kosher meals," misidentified the alleged constitutional violation. For, the prison officials were not refusing to provide Resnick with kosher meals; rather, they merely were requiring him to file a standardized application before doing so.

If it had performed the balancing analysis—focusing on Resnick's failure to file the required CFP application rather than the prison's alleged denial of kosher food—the district court's own findings of fact and conclusions of law, viewed in light of *Turner*'s four factors, would support the conclusion that there was no constitutional violation.

The first *Turner* factor requires "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254 (citation and internal quotation marks omitted). The "legitimate governmental interest" at stake here is the orderly administration of a program that allows federal prisons to accommodate the religious dietary needs of thousands of prisoners. *See* 28 C.F.R. § 548.20(stating that inmates will be given a "reasonable and equitable opportunity to observe their religious dietary practice *within the constraints of budget limitations and the security and orderly running of the institution*") (emphasis added); P.S. 4700.04 (stating that the purpose of the common fare program is "[t]o standardize management of all Food Service operations within the Bureau."). The application for the CFP supplied to each incoming inmate at Lompoc has a "valid, rational connection" to this legitimate interest: It sets forth the ground rules of the CFP, provides an opportunity for the chaplain to assess the sincerity of the applicant's belief, and, most important, provides a standardized form for each inmate seeking accommodation, thereby aiding in the administration of the program—no small matter in a prison such as Lompoc with over 1,800 inmates. Thus, the first *Turner* factor is satisfied.

The second factor in determining the reasonableness of a prison regulation under *Turner* is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner,* 482 U.S. at 90, 107 S.Ct. 2254. This factor also cuts in favor of the prison officials since Resnick has not shown, and indeed cannot show, that he would not have been provided with a kosher diet had he filed the proper application. For, prison officials not only were willing to work with Resnick once he submitted his application to ensure his needs were met, there also was at least one other inmate at Lompoc

receiving a completely kosher diet.[7]

The third *Turner* factor requires courts to consider "the impact accommodation of the asserted constitutional right will have" on other inmates, the guards, and prison resources. *Turner,* 482 U.S. at 90, 107 S.Ct. 2254. Again, the accommodation Resnick seeks is *not* of his right to a kosher diet, but rather of his right to a kosher diet *without having to file the standard application.* To accommodate this request would be to frustrate the orderly administration of the CFP and of Lompoc generally by effectively eliminating the requirement that inmates seeking religious diets fill out a standardized application form. Furthermore, by providing a procedure by which religious believers can request and receive special diets, it would appear that the prison has acted to advance, not infringe, the free exercise rights of the inmates. It would be a strange result indeed to conclude that such a program—designed to *facilitate* the accommodation of the religious dietary needs of thousands of inmates—actually *violates* inmates' First Amendment rights. The third *Turner* factor, then, also cuts in favor of the prison officials.

The fourth and final *Turner* consideration is the availability of "obvious, easy alternatives." *Turner,* 482 U.S. at 90, 107 S.Ct. 2254. It is difficult to think of any alternatives more "obvious" and "easy" than simply requiring each inmate seeking a religious diet to fill out the standard CFP application form. Indeed, the solution Resnick advocates—that the application requirement be waived or that his letters to prison authorities be deemed sufficient in lieu of the application itself—would make accommodating prisoners' religious dietary needs a far more complicated affair. As it stands, the CFP at Lompoc provides for a uniform procedure for inmate requests, one that allows the prison to channel those requests through the chaplain's office, which assesses the sincerity of his request for a religious diet and, upon approval, enters the prisoner into a computerized database. The database alerts the food services department while also allowing the prison to keep track of who has specifically requested a special diet. Allowing inmates to make requests outside this system by letters sent to various prison officials would frustrate the orderly administration of the CFP at Lompoc and other prisons. *See Jackson–Bey,* 115 F.3d at 1097("Registration puts the institution on notice that certain religious accommodations will likely be sought and thereby provides the institution with time to consider if and how to implement them.... In short, registration places, at most, a slight burden on an inmate's right to religious freedom while serving as an important and beneficial 'bright line' that enables prison officials to ascertain the seriousness of the inmate's religious commitment and respond accordingly.").

We are especially cognizant of the realities of prison administration—realities which make prison administration "an inordinately difficult undertaking that

---

7. It is this factor that distinguishes Resnick's claim from those of the inmates in *Ward* and *Ashelman.* In those cases, inmates seeking kosher diets were explicitly denied kosher diets. That is to say, the prison officials in *Ward* and *Ashelman* did not deny that they were refusing to supply the complaining inmates with kosher food. Rather, they openly admitted that they were not doing so and argued that the Constitution did not require them to do so. *See Ashelman,* 111 F.3d at 676(noting that a kosher diet could not be prepared in the prison's kitchen) and *Ward,* 1 F.3d at 877 (finding that the warden "does not provide a full kosher diet"). Here, however, prison officials do not dispute that Resnick has a right to a kosher diet; they argue only that requiring him to comply with the application requirement does not violate that constitutional right.

requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 85, 107 S.Ct. 2254. We are also guided by the Court's admonition that, when it comes to judicial review of prison regulations, "separation of powers concerns counsel a policy of judicial restraint." *Id.* Accordingly, we conclude that, under *Turner*'s four-part analysis, the requirement that

Resnick submit an application to the CFP before prison officials attempted to provide him with a kosher diet is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. The application requirement, therefore, cannot be said to abridge Resnick's First Amendment rights.[8]

Because there is no constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.[9]

8. Even if we were to conclude that Resnick has alleged facts sufficient to establish a constitutional violation, we note that summary judgment would still be appropriate. For "the next, sequential step" in the qualified immunity analysis "is to ask whether the right was clearly established." *Saucier*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272. In determining whether a particular right is clearly established, "[t]he question is what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards." *Saucier*, 533 U.S. at 208, 121 S.Ct. 2151; *see also Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

In this case, Adams and Szafir were acting within the context of a federal prison. It is "clearly established" that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone*, 482 U.S. at 348, 107 S.Ct. 2400 (citation and quotation marks omitted). As noted above, it is also clearly established that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. The application requirement for the CFP at Lompoc, as the district court noted, serves two such interests. First, it enables prison officials to assess the sincerity of an inmate's religious belief. *See McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir.1987) ("It is appropri-

ate for prison authorities to deny a special diet if an inmate is not sincere in his religious beliefs."). Second, requiring each inmate requesting a religious diet to file an identical form containing information regarding the CFP aids in the efficient and orderly administration of the prison. It is therefore eminently reasonable for Adams and Szafir to have believed that requiring Resnick to file an application for the CFP was lawful.

Additionally, Adams and Szafir were acting in reliance on 28 C.F.R. § 548.20(a), as elaborated in P.S. 4700.04 and Lompoc regulations, when they required Resnick to submit an application. We have held that "when a public official acts in reliance on a duly enacted statute or ordinance, that official ordinarily is entitled to qualified immunity." *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999).

9. We also must reject Resnick's contention that this court's decision in *Sloman v. Tadlock*, 21 F.3d 1462, 1467–68 (9th Cir.1994), requires us to conclude that the issue of reasonableness in this context was a factual question for the jury, not the judge, to decide. *Sloman* does not compel a different outcome in the present case. Whoever makes the reasonableness determination—whether it be the court or the jury—*Saucier* makes clear that such a determination can be made *only if* we first conclude that a constitutional right has been violated. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. Because we conclude that Resnick's First Amendment rights were not violated, "there is no necessity for further inquiries" into the reasonableness of Adams' and Szafir's behavior. *Id. Sloman*'s holdings with respect to who gets to make the reasonableness determination and when are therefore inapplicable here.

## IV

Finally, Resnick contends that the prison officials' refusal to investigate and to correct problems with the CFP at Lompoc was itself unreasonable and a violation of Resnick's First Amendment rights. As noted above, however, rather than failing to investigate and to answer Resnick's complaints about the CFP at Lompoc, prison officials promised to work with him—once he filed the proper form—to ensure that any problems he had with the program were addressed. Thus, Resnick's charge that the officials failed to investigate is belied by their own promises to conform the CFP to meet Resnick's needs.

Furthermore, as the district court correctly noted, "[u]nless Resnick participated, or attempted to participate, in the Common Fare Program, he could not be injured by, and would have no standing to challenge, deficiencies in the administration of the program at Lompoc." *See Madsen v. Boise State University*, 976 F.2d 1219, 1220–21 (9th Cir.1992) ("There is a long line of cases ... that hold that a plaintiff lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit."). If Resnick lacks standing to challenge the deficiencies of the program itself, surely he cannot challenge an alleged failure to investigate allegations of deficiencies in that same program.

The sole precedent cited by Resnick in support of this claim, *Alexander v. Perrill*, 916 F.2d 1392 (9th Cir.1990), by his own admission, involved a situation in which prison officials "did nothing to inquire into or investigate[the inmate's] complaints." *Id.* at 1395. Here, as noted, prison officials stood willing to work with Resnick to correct any problems he had with the CFP. That prison officials never did so is the result of Resnick's failure to comply with the requirement that he apply for the CFP rather than any dereliction of duty on the part of the officials. And since it was not unreasonable for prison officials to require Resnick to apply for the CFP before providing him with a kosher diet, it similarly cannot be unreasonable for them to require him to apply to the program before working with him to address his complaints about it.

Because Resnick has not alleged facts sufficient to constitute a constitutional violation, we conclude that the district court's order granting summary judgment to the prison officials must be.

**AFFIRMED.**